```
                                              USDC SDNY
                                              DOCUMENT
UNITED STATES DISTRICT COURT                  ELECTRONICALLY FILED
SOUTHERN DISTRICT OF NEW YORK                 DOC #: _____
                                              DATE FILED: 9/18/2023
```

UNITED STATES OF AMERICA,

    -v.-　　　　　　　　　　　　　　　　　　　23-CR-140 (NSR)
　　　　　　　　　　　　　　　　　　　　　　　　　OPINION & ORDER
TAMEEK WHITE,

                Defendant.

NELSON S. ROMÁN, United States District Judge:

Defendant Tameek White ("Defendant") was charged on March 16, 2023, with one count of being a felon in possession of ammunition in violation of 18 U.S.C. § 922(g)(1). ((ECF No. 21.) On June 30, 2023, Defendant filed a motion to dismiss Information pursuant to Federal Rules of Criminal Procedure 12 challenging the constitutionality of 18 U.S.C. § 922(g)(1) (ECF No. 30.). For the following reasons, Defendant's motion to dismiss is DENIED.

## BACKGROUND

The Complaint alleges that on or about July 24, 2022, Mount Vernon Police Department ("MVPD") officers responded to a report of shots fired in the vicinity of 204 Union Avenue in Mount Vernon, NY. (ECF No. 2 at ¶ 3). MVPD officers canvassed the area and reviewed surveillance footage (*Id.*). That footage showed, at approximately 10:44am, a male dressed in a grey t-shirt, jeans, and black fanny pack ("Shooter-1") walking down East Third Street towards Union Avenue. (*Id.*) Shooter-1 removed what appeared to be a handgun from the fanny pack. (*Id.*). Before reaching Union Avenue, Shooter-1 appeared to see another individual ("Shooter-2") near the corner of East Third Street and Union Avenue, at which time Shooter-1 chased after Shooter-2. (*Id.*).

Shooter-2 appeared to fire first at Shooter-1, who appeared to return fire before ducking behind a parked car for cover. (*Id*.) Shooter-1 is then shown attempting to fire his handgun again in the direction of Shooter-2 before retreating behind the parked car. (*Id*.). Shortly thereafter, Shooter-1 began walking back down East Third Street away from Union Avenue. (*Id*.)

At least one of the surveillance recordings reviewed by law enforcement contained audio of what appears to be shots being fired. (*Id*.). Other surveillance footage shows muzzle flashes and shells being expelled from Shooter-2's handgun. (*Id*.). MVPD officers who responded to the scene recovered one .45 auto caliber PMC shell from underneath the tire of the parked vehicle where Shooter-1 appeared to fire his handgun. (*Id*.).

On or about July 27, 2022, MVPD detectives who had reviewed at least some of the surveillance footage observed an individual who resembled Shooter-1 on South Second Avenue in Mount Vernon. (*Id*.). After approach, the individual identified himself as "Tameek Rashard White" and provided a date of birth. (*Id*.). Using that date of birth, law enforcement officers obtained a criminal history report for a "Tameek Rashard White", which indicated several prior felony convictions and that the individual was on parole status until approximately March 2022. (*Id*.)

On or about July 28, 2022, MVPD detectives showed surveillance footage, and a still image taken therefrom, to a New York State Parole Officer who had supervised Defendant from approximately 2020 through March 2022. (*Id*.). Based on that footage and still image, the Parole Officer identified Shooter-1 as the Defendant. (*Id*.). The criminal history records for Defendant indicate that on or about September 16, 2019, Defendant plead guilty in Kings County Supreme Court to second-degree burglary, violating New York Penal Law § 140.25(2). (*Id*. at ¶ 5). Defendant was sentenced principally to 42 months' imprisonment on October 1, 2019. (*Id*.).

Subsequently, Defendant was charge with knowingly possessing ammunition after having previously been convicted in court of a crime punishable by imprisonment for a term exceeding one year. (ECF No. 21, at ¶ 1).

On June 30, 2023, Defendant filed a motion to dismiss the Information (ECF No. 21) on grounds that the Second Amendment of the United States Constitution renders 18 U.S.C. § 922(g)(1) facially unconstitutional. ("Def. Motion") (ECF No. 30). The Government filed an opposition on July 31, 2023. ("Gov't Opposition") (ECF No. 32), and the Defendant replied on August 27, 2023 ("Def. Reply") (ECF No. 34).

## LEGAL STANDARD

The Second Amendment to the Constitution of the United States provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. CONST. amend. II. "In *District of Columbia v. Heller*, 554 U.S. 570 (2008) and *McDonald v. Chicago*, 561 U.S. 742 (2010)," the Supreme Court held that "the Second and Fourteenth Amendments protect the rights of ordinary, law-abiding citizens to possess a handgun for self-defense outside the home." *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111, 2122 (2022).

*Bruen* set forth a new framework for analyzing Second Amendment claims: (1) "when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct . . ." and therefore, (2) "the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Id.* at 2126. In other words, at the second step, "the government must affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Id.* at 2127.

"When confronting . . . present-day firearm regulations, [the] historical inquiry that courts will conduct will often involve reasoning by analogy . . . ." *Id.* at 2132. Such reasoning requires "that the government identify a well-established and representative historical *analogue*, not a historical *twin*. So even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster." *Id.* at 2133 (emphasis in original). Relying on *Heller* and *McDonald*, the Supreme Court further directed lower courts to focus their analysis on at least two "metrics" when analyzing firearm regulations: "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Id.* That is, courts must consider: (1) "whether modern and historical regulations impose a comparable burden on the right of armed self-defense"; and (2) "whether that burden is comparably justified." *Id.*

The Supreme Court has also identified historical sources enacted around the time the Second (1791) and Fourteenth (1868) Amendments were adopted as particularly instructive, noting that

> when it comes to interpreting the Constitution, not all history is created equal. Constitutional rights are enshrined with the scope that they were understood to have when the people adopted them. The Second Amendment was adopted in 1791; the Fourteenth in 1868. Historical evidence that long predates either date may not illuminate the scope of the right if linguistic or legal conventions changed in the intervening years. It is one thing for courts to reac[h] back to the 14th century for English practices that prevailed up to the period immediately before and after the framing of the Constitution. It is quite another to rely on an ancient practice that had become obsolete in England at the time of the adoption of the Constitution and never was acted upon or accepted in the colonies.

*Id.* at 2136 (internal quotations and citations omitted).

> Similarly, we must also guard against giving post-enactment history more weight than it can rightly bear. It is true that in *Heller* we reiterated that evidence of how the Second Amendment was interpreted from immediately after its ratification through the end of the 19th century represented a critical tool of constitutional interpretation. We therefore examined a variety of legal and other sources to determine *the public understanding* of [the Second Amendment] after its . . .

4

>ratification. And, in other contexts, we have explained that a regular course of practice can liquidate & settle the meaning of disputed or indeterminate terms & phrases in the Constitution.

*Id*. (internal quotations and citations omitted) (emphasis in original).

Lastly, "other cases implicating unprecedented societal concerns or dramatic technological changes may require a more nuanced approach." *Id.* at 2132. This is because "[t]he regulatory challenges posed by firearms today are not always the same as those that preoccupied the Founders in 1791 or the Reconstruction generation in 1868." *Id.* Nonetheless, "the Constitution can, and must, apply to circumstances beyond those the Founders specifically anticipated." *Id.*

## DISCUSSION

Here, Defendant argues that, post-*Bruen*, 18 U.S.C. § 922(g)(1) is facially unconstitutional. (Def.'s Mot. to Dismiss at p. 7).

### I. The Constitutionality of § 922(g)(1) post-*Bruen*

#### a. Discussion of the Prohibition on Felons Possessing Firearms & Ammunition in *Heller*, *McDonald*, and *Bruen*

Before turning to the *Bruen*'s mandated analysis, the Court first considers the Supreme Court's discussion of the propriety of the prohibition on felons possessing firearms and ammunition in *Bruen*, *McDonald*, and *Heller*. *Heller* explicitly stated "nothing in [this] opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons . . . ." *Heller*, 554 U.S. at 626. *McDonald* "repeated that assurance[.]" *McDonald*, 561 U.S. at 786.

*Bruen*'s majority opinion does not directly address the issue. *Bruen*'s concurrences and dissent, however, are not shy in their support for the bar on felons possessing firearms. In his concurrence, Justice Alito insisted that *Bruen* did not "disturb[] anything that [was] said in *Heller* or *McDonald* . . . about restrictions that may be imposed on the possession or carrying of guns. *Id.*

at 2157 (Alito, *J.*, concurring). Justice Kavanaugh, joined by Chief Justice Roberts, was express that "[p]roperly interpreted, the Second Amendment allows a variety of gun regulations . . ." before citing with approval *Heller*'s statement that the prohibition on felons possessing firearms stands without question. *Id.* at 2162 (Kavanaugh, *J.*, joined by Roberts, *C.J.*, concurring) (internal quotations and citations omitted). Finally, the dissent reads the *Bruen* majority "to cast no doubt" on that same assertion. *Id.* at 2189 (Breyer, *J.*, joined by Sotomayor and Kagan, *J.J.*, dissenting). In sum, then, four active justices[1] have made clear their opinion that the prohibition on felons possessing firearms made explicit in *Heller*, and already once expressly reaffirmed, is constitutional.

While the Court finds the foregoing to be sufficient grounds to hold § 922(g)(1) constitutional—and indeed already has, *see, United States v. King*, 634 F. Supp. 3d 76, 83 (S.D.N.Y. 2022)—prudence compels the Court to evaluate § 922(g)(1)'s constitutionality under the *Bruen* framework.

### b. *Bruen* Analysis

At the outset, § 922(g)(1) unquestionably implicates the plain text of the Second Amendment. *Bruen*, 142 S. Ct. at 2122. The question then becomes whether felons fall within the meaning of "the people" that the Second Amendment was intended to protect.

### i. Whether Felons Are Within the Scope of "People" Protected by the Second Amendment

---

[1] The Government also notes that, two years prior to *Bruen*, Justices Thomas and Gorsuch joined an opinion from Justice Alito noting "history supported the constitutionality of some laws limiting the right to possess a firearm, such as laws . . . prohibiting possession by felons and other dangerous individuals." Gov't Opp. at p.5, fn. 2 (citing *N.Y. State Rifle & Pistol Ass'n, Inc. v. City of New York*, 140 S.Ct. 1525, 1540-41 (2020) (Alito, *J.*, joined by Thomas and Gorsuch, *J.J.*, dissenting).

Notably, the *Bruen* majority focused its analysis solely on the right of law-abiding citizens to possess a firearm for self-defense. *See, e.g, Bruen*, 142 S. Ct. at 2122 ("[W]e recognized that the Second . . . Amendment protect[s] the right of an ordinary, law-abiding citizen to possess a handgun in the home for self-defense."); *Id*. at 2124-25 (noting that the petitioners were "law-abiding . . . citizens . . . ."); *Id*. at 2132-33 (expressly premising *Bruen*'s new analytical framework on discerning "how and why [a] regulation burden[s] a law-abiding citizen's right to self-defense.") Similarly, *Heller* and *McDonald* also limit their Second Amendment analyses to law-abiding citizens. *See, e.g., Heller*, at 554 U.S. at 635; *McDonald*, 561 U.S. at 790. The omission of any concrete discussion of whether felons fall within the scope of "the people" is not, however, dispositive of the issue.

*Heller* states that "the people" refers to the "political community", who are those that "are part of a national community or who have otherwise developed sufficient connection with [the United States] to be considered part of that community." *Heller*, 554 U.S. at 580 (citing *United States v. Verdugo-Urquidez*, 494 U.S. 259, 265 (1990)). It is a difficult proposition to categorically remove felons from those individuals who are part of the national community. *Id*. The Court finds illuminating the *Bruen* majority's statement that the Second Amendment "surely elevates above all other interests the right of law-abiding, responsible citizens to use arms for self-defense." *Id.* at 2131 (citing *Heller*, 554 U.S. at 535) (internal quotations omitted). From this, it follows that the Second Amendment rights afforded to felons, if any, are not so comprehensively protected as those held by law-abiding citizens. *See also, Id.* at 2128 (citing *Heller* for the proposition that Second Amendment rights are not unlimited (internal citations and quotations omitted)). It does not necessarily follow, though, that felons are completely removed from the scope of the Second Amendment's protection. Thus, upon consideration of the foregoing, the Court holds that felons

7

are included with the scope of "the people" as contemplated by the Second Amendment—as other courts in this District have held, *see, United States v. Davila*, 2023 WL 5361799, at *2 (S.D.N.Y. August 22, 2023). As such, the Courts turns to the historical understanding of those protections at the time the Second Amendment was enacted to assess whether § 922(g)(1) violates said protections.

### ii. The Nation's History of Firearm Regulation

The Government bears the burden of showing that § 922(g)(1) is consistent with the nation's history of firearm regulation. *Bruen*, 142 S. Ct. at 2126. That is, the Government must show that § 922(g)(1) imposes a "comparable burden" on the right of felons to possess arms and ammunition and that said burden is "comparably justified" as an analogous historical regulation. *Id*. at 2133. Defendant summarily states that no such a tradition of regulation exists. *See,* (Def. Mot. at p. 8); (Def. Reply at p.2) Defendant also claims that the first such statutes barring felons from possessing firearms and ammunition only arose in the 20th century. (Def. Mot. At p. 8; Def. Reply at p.2).

The Government takes a more comprehensive approach, providing examples from 17th century England (Gov't Opp. at p. 12-13); the Colonial Era (*Id*. at p. 13-14); the Revolutionary War (*Id*. at p. 14-16) and the debates over the ratification of the Bill of Rights (*Id*. at p. 16-18).[2] Taken together, the Government contends these examples demonstrate that there was a "robust tradition" of legislatures disarming categories of individuals it deemed a threat to ordered society and compliance with legal norms at the time the Second Amendment was ratified. (*Id*. at p. 12).

---

[2] While the Court does not take the Supreme Court's approving examples of "14th century . . . English practices" and "evidence of how the Second Amendment was interpreted from immediately after its ratification through the end of the 19th century", *Bruen*, 142 S. Ct at 2136 (internal quotations and citations omitted), as hard and fast temporal bounds within which sources may yield compelling historical analogues, the Court does note that all of the Government's examples fall well within that timeframe and thus find them to carry persuasive weight.

This Court agrees, as have others. *See, e.g., United States v. Jackson*, 69 F.4th 495, 504 (8th Cir. 2023).

For instance, in the late 1860s, the English parliament prohibited Catholics from possessing arms and ammunition absent a renunciation of their faith—enacted after the Glorious Revolution of 1688, which saw a Protestant claimant displace the reigning Catholic monarch. (1 W. & M., Sess. 1, c. 15, in 6 *Statutes of the Realm* 71-73 (1688)). Catholics were targeted for disarmament due to the view they were "unwilling to obey the government and its laws." *Jackson*, 69 F.4th at 502. Similarly, some colonial governments also disarmed Catholics. *Id*. at 502-03 (citing Michael A. Bellesiles, *Gun Laws in Early America, The Regulation of Firearms Ownership, 1607-1794*, 16 LAW & HIST. REV. 567, 574 (1998). Racial restrictions on gun ownership were also widespread throughout the colonies based on the view that non-white races were dangerous.[3] *See Jackson*, 69 F.4th at 502 (citing Bellesiles, *supra*, at 578-79;); *see also, Davila*, 2023 WL 5361799 at *3 (citing Saul Cornell, *A Well-Regulated Militia: The Founding Fathers and the Origins of Gun Control in America* 28-29 (2006)). Moreover, the Government musters numerous examples of state legislatures during the Revolutionary disarming those individuals who were not sufficiently supportive of, or loyal to, the American cause. *See, e.g., The Public Records of the Colony of Connecticut From May, 1775 to June, 1776*, at 1993 (1890) (1775 Conn. law); *The Acts and Resolves, Public and Private, of the Province of the Massachusetts Bay* 479-84 (1886) (1776 Mass. law); *Records of the Colony of Rhode Island and Providence Plantations in New England* 567 (1862) (1776 R.I. law); *The Public Acts of the General Assembly of North Carolina* 231 (1804) (1777 N.C. law); *Acts of the General Assembly of the State of New-Jersey at a Session Begun on the 27th Day of August, 1776*, at 90 (1777) (1777 N.J. law); *The Statutes at Large of Pennsylvania*

---

[3] It goes without saying that such religious and racial restrictions would be flagrantly unconstitutional today.

*from 1682 to 1801*, at 112-13 (1903) (1777 Pa. law); *The Statutes at Large; Being a Collection of All the Laws of Virginia* 282 (1821) (1777 Va. law). The Continental Congress itself even recommended the states enact such laws. *Journals of the Continental Congress 1774-1789*, at 205 (1906) (resolution of March 14, 1776).

Perhaps most persuasive is the Government's "highly influential" example that arose from debate at the Pennsylvania ratifying convention for the Constitution. *Heller*, 554 U.S. at 604. During these debates, a minority of delegates insisted that the Constitution should have a Bill of Rights. Bernard Schwartz, *The Bill of Rights: A Documentary History* 627 (1971). Though initially unsuccessful, these delegates won the day four years later with the adoption of the Bill of Rights, which was greatly influenced by proposals set forth by the delegates. (*Id.* art 628). Most notably, these delegates proposed a right to bear arms that was unqualified "unless for crimes committed, or real danger of public injury from individuals." (*Id*. at 665).

The Government also offers compelling evidence of a tradition on barring those deemed dangerous from possessing ammunition. England's law disarming Catholics extended not just to arms, but also to "Gunpowder [and] Ammunition . . . ." W. & M., Sess. 1, c. 15, in 6 The Statutes of the Realm 71-73 (1688). Some of the racial restrictions of the colonial era expressly extended to powder and ammunition. *See, e.g., The Statues at Large; Being A Collection of All the Laws of Virginia* 255-56 (1823); *Records of the Colony of Rhode Island and Providence Plantations* 561 (1857). Similarly, the Government has shown that Rhode Island, New Jersey, and Pennsylvania's Revolutionary War-era loyalty laws encompassed not just arms, but also ammunition. *See, Records of the Colony of Rhode Island and Providence Plantations* 567 (1857); *Acts of the General Assembly of the State of New-Jersey at a Session Begun on the 27th Day of August, 1776*, at 90 (1777); *Act of Apr. 1, 1778*, ch. LXI, § 5, 1777-1778 P.A. Laws 123, 126.

The Court is also persuaded by the Government's historical evidence relating to punishment for felonies. Under English law shortly before the Revolution, conviction of a felony could lead to "total forfeiture" of land and goods and was "generally connected with that of capital punishment . . . ." William Blackstone, *Commentaries on the Laws of England*, 95, 98 (1769). The colonies and later states continued to punish felonies in the same way. *See Folajtar v. Attorney General*, 980 F.3d 897, 904-05 (3d Cir. 2020); *Baze v. Rees*, 554 U.S. 35, 94 (2008) (Thomas, *J.*, joined by Scalia, *J.*, concurring in the judgment). Notably, the First Congress extended capital punishment for felony convictions to even non-violent conduct, such as forgery and counterfeiting. An Act for the Punishment of Certain Crimes Against the United States, 1. State. 112-15 (1790). It is a difficult row to hoe to suggest the generation that drafted and enacted the Second Amendment could countenance capital punishment for a non-violent felony, but not a prohibition on the possession of arms and ammunition.

Taken together, the foregoing is sufficient to show a tradition in the nation's history of disarming categories of individuals, including prohibiting those individuals from possessing ammunition, that the legislature considers dangerous to ordered society and compliance with legal norms. Therefore, the Court now turns to whether § 922(g)(1) is sufficiently analogous to this tradition by scrutinizing "how and why" it burdens felons' rights—and it is. *Bruen*, 142 S. Ct. at 2133 As to "how", § 922(g)(1) is identical to this tradition: it disqualifies a discrete group of individuals, felons. The "why" is also identical: Congress has identified this group of individuals as dangerous ordered society and are, inherently, not in compliance with legal norms. *See also, Davila*, 2023 WL 5361799 at *5. That is, the Government has established "a well-established and historical analogue, [even if it is] not a historical twin . . . ." for § 922(g)(1). *Bruen*, 142 S. Ct. at 2133

Accordingly, the Court holds that § 922(g)(1) does not run afoul of the Second Amendment.

## CONCLUSION

For the foregoing reasons, Defendant's motion to dismiss is DENIED. The Clerk of Court is respectfully directed to terminate the motion at ECF No. 30.

Dated:   September 18, 2023                                        SO ORDERED:

White Plains, New York

_____

NELSON S. ROMÁN

United States District Judge